## COURT OF APPEALS.

### The People agt. John Hendrickson, jr.

The testimony of a person examined as a witness before a coroner's jury, such person not being at the time under arrest or charged with crime, may be given in evidence against him on his subsequent trial for the alleged murder of the deceased.

The witness in such case stands on the same footing as witnesses on the trial of issues. He is not bound to criminate himself, and may decline to answer as to whatever tends to do so; and if he fail to avail himself of his privilege, his answer will be deemed voluntary, and may be given in evidence against him. It is only when he is compelled to answer after having declined to do so, that the answer will be deemed compulsory, and will be excluded.

On the trial of a prisoner for the murder of his wife, the prosecution was permitted to introduce in evidence the will of the father of the deceased, by which it appeared that the testator devised all his property to his wife for life, and after her death to his three children in unequal proportions, the one to take one-half, and the deceased one-fourth, and her sister one-fourth—*held*, that such evidence was properly admitted as bearing upon the question of motive.

John K. Porter, *for Prisoner.*
Hamilton Harris, *for People.*

By the Court—Parker, Judge. The wife of Hendrickson died on Sunday, the 6th of March. On the evening of the next day a coroner's inquest was held, before which Hendrickson was sworn and examined as a witness. He stated the circumstances attending the death of his wife. When interrogated as to his having been in Albany, he said he had been there "two weeks ago last Saturday;" and when asked if he had not been there since, he said, " O, yes, I believe I was there a week ago last Saturday," as if correcting himself; and on being further interrogated, said, "I was there last Saturday." He further stated the object of his going to Albany, and mentioned several places in the city where he had been, but said he did not remember having been into Springsteed's drug store or any other drug store.

Upon the trial at the Oyer and Terminer, the counsel for the prosecution offered to prove the statement so made at the coroner's inquest. The counsel for the prisoner objected to the

evidence, on the ground that what the prisoner swore to on tha occasion was not a voluntary statement. The objection was overruled and the evidence received, to which the counsel for the prisoner excepted; and the alleged erroneousness of that decision constitutes the first ground on which the prisoner relies for a reversal of the judgment.

I. The general rule is, that all a party has said which is relevant to the questions involved in the trial, is admissible in evidence against him. The exceptions to this rule are where the confession has been drawn from the prisoner by means of a threat or a promise, or where it is not voluntary, because obtained compulsorily or by improper influence. It is not claimed in this case, that the statement in question was obtained by means of any promise or threat, or by any inducement whatever; nor is it supposed that there was any compulsion or any influence affirmatively exercised upon the mind of the prisoner, beyond what is sought to be inferred from the fact, that he was required to testify as a witness. But it is contended that because he was so required to testify, upon a general inquiry into the cause of the death of his wife, his statement was not voluntary, and should have been excluded. The record shows that the objection at the trial was placed only on the ground that the statement was not voluntary.

Hendrickson was not in custody. He made no objection to being sworn as a witness, or to answering any question that was put to him. He was treated, in every respect, like the other witnesses. At the time of his examination, no circumstances had been developed warranting a suspicion against him. The *post mortem* examination did not take place till the next day, and it was not until the second day after his testimony before the coroner's inquest that he was arrested under a warrant issued, not by the coroner, but by a police justice of the city of Albany. His statement as a witness was in no respect an admission of guilt. On the contrary, it was a denial of material facts attempted, on his trial, to be established by other witnesses. His testimony was calculated to ward off suspicion from himself, not to attract it toward him.

The question presented, therefore, is, whether, under the circumstances, the statement of a witness is to be excluded on the ground that it was not voluntarily made.

Several English *nisi prius* decisions were cited on the argument, which it is necessary to examine.

Merceron's case, (2 *Starkie, R.* 366,) decided in 1818, was an indictment against a magistrate for having corruptly and improperly granted licenses to public houses which were his own property. ABBOT, J., permitted the prosecution to prove what the defendant had said in the course of his examination before a committee of the House of Commons, appointed for the purpose of inquiring into the police of the metropolis, though it was objected that the statement had been made under a compulsory process from the House of Commons, and that the declarations were not voluntary.

In the case of Haworth, (4 *Carr. and Payne,* 254,) decided in 1830, it appeared that before the prisoner was charged or suspected, a person named Shearer had been examined on the charge of forgery, and that the prisoner was called as a witness against Shearer, and his deposition taken. The counsel for the prosecution proposed to read this deposition as evidence against Haworth, which was objected to. Justice J. PARKE said, " I think that I ought to receive this evidence. The prisoner was not, when he made this deposition, charged with any offence, and he might, on that as well as on any other occasion when called as a witness, have objected to answer any question which might have a tendency to expose him to a criminal charge ; and not having done so, his deposition is evidence against him."

In a note by the reporter to this case, it is said, that in a case tried at Worcester, where it appeared that a coroner's inquest had been held on the body of A, and it not being suspected that B was at all concerned in the murder of A, the coroner had examined B upon oath as a witness. PARKE, J., would not allow the deposition of B so taken on oath on the coroner's inquest to be read in evidence, on the trial of an indictment afterward found against B for the same murder.

I cannot find that this anonymous case is anywhere reported

more fully. It would be much more satisfactory to know the particular circumstances of the case and the grounds for the decision. Without them, it is entitled to but little weight as authority. And so it seems to have been viewed by LITTLE- DALE, Justice, in the case of Rex agt. Clewes, tried before him during the same year, and reported as to other points in 4 *Carr. and P.*, 221. In Mr. Greaves's note *w*, 2 *Russ. on Crimes*, 860, 7 *Am. ed.*, on the authority of his manuscript notes, he says, the grand jury asked LITTLEDALE, J., "can evidence of a prisoner who was examined on oath before the coroner as a witness be admitted as evidence against the same person, when subsequently indicted for the murder of the person on whose body the inquest was held?" LITTLEDALE, J., answered in the affirmative; when the case referred to in the anonymous note being mentioned, the judge (Littledale) directed the grand jury to receive the evidence and leave the point for discussion on the trial.

Tubby's case (5 *Carr. and P.*, 530) tried in 1833, was an indictment for burglary. Andrews, for the prosecution, pro- posed to read a statement made upon oath by the prisoner, at a time when he was not under any suspicion. Pendergast ob- jected that it was a violation of the rule of law, which held that a prisoner should not be sworn. VAUGHAN, B., said, "I do not see any objection to its being read, as no suspicion at- tached to the party at the time. The question is, is it the statement of the prisoner under oath? Clearly it is not, for he was not a prisoner at the time he made it."

In Rex agt. Lewis, (6 *Carr. and P.* 161,) decided also in 1833, several persons, one of whom was the prisoner, were summoned before the committing magistrate touching the poison- ing of C. No person was then specifically charged with the offence. The prisoner was sworn, and made a statement, and at the conclusion of the examination she was committed for trial. It was held that this statement was not receivable in evidence against the prisoner. GURNEY, B., said this case was quite distinguishable from that of Rex agt. Tubby, and that under the circumstances he should have agreed with his

brother VAUGHAN. "But (he said) this being a deposition made by the prisoner at the same time as all the other depositions on which she was committed, and on the very ·same day on which she was committed, I think it is not receivable. I do not think this examination perfectly voluntary." It has been supposed the prisoner was brought before the magistrate on a charge or suspicion of guilt, but Mr. Greaves says, in his notes, (2 *Russ. on Cr.* 857, 7 *Am. ed. note n,*) that he was counsel in this case, and that the prisoner was summoned in the ordinary way, as a person who could give some evidence touching the matter, and not because any suspicion attached to her.

In Rex agt. Davis, (6 *Carr. and P.* 177,) also decided in 1833, the daughter had been examined as a witness before the committing magistrate against her father, and was then committed as a joint receiver of stolen goods with him. Her statement was excluded as evidence against her on her trial by GURNEY, B., on the same ground, as in Rex agt. Lewis. In regard to this case, Mr. Greaves says, (2 *Russ. on Cr.* 857, *note n,* 7, *Am. ed.,*) that the ground of the decision was, not that there was a suspicion in the mind of the magistrate, or even that the prisoner might be aware that there was such a suspicion, but that the prisoner had been examined *on oath as a witness,* and says, that after the decision in the late case of Rex agt. Wheater, (to which I shall refer hereafter,) it may be doubted whether that was a sufficient reason for rejecting the deposition.

In Regina agt. Wheeley, decided in 1838, (8 *Carr. and P.* 250,) a party who was charged with murder made a statement before the coroner at the inquest, which was taken down. The paper purported that the statement was made on oath. ALDERSON, B., held on the trial of the party for murder, that the statement was not receivable, and that parol evidence was not admissible to show that no oath had in fact been administered to the prisoner. If this was a case of the examination of a prisoner, and not of a witness, as it has been understood to be by commentators, (*Russ. on Cr.* 855 *and* 860, *and notes,*) its correctness will not be questioned, and it can have no bearing upon the question now before us.

The next case, in order of time, was Regina agt. Wheater, (2 *Moody's Crown Cases*, 45,) decided in 1838, which was an indictment for forgery. On the trial, before COLERIDGE, J., the examination of the prisoner previously taken on oath, as a witness, before the commissioners of bankruptcy, concerning the bills alleged to be forged, was held anmissible as evidence against him. The opinion of all the judges was desired on this point, and the case was argued before all the judges, except PARK, J., and GURNEY, B., who held that the evidence had been properly received.

In Regina agt. Owen and al, (9 *Carr. and P.* 83,) tried in 1839, the defendants were indicted for rape. The prosecution offered to prove the statements made by Owen on oath at the inquest held on the body of the person ravished, while the defendants were in custody. The counsel for the prisoners admitted that where witnesses had been examined voluntarily, their deposition might afterward be read against them; but objected that these defendants were in custody, and cited the case of Wheeley, where Baron ALDERSON rejected the deposition because it was on oath and taken while in custody. But WILLIAMS, J., said, "I know that my brother ALDERSON did so; but I also know that there has been a reaction in opinion, (if I may be allowed the expression.) I shall therefore receive the evidence and reserve the point, if it shall become necessary." It is said that Baron ALDERSON, who had tried Wheeley's case, was in the next court, at this time, and that WILLIAMS, J., had consulted with him in an earlier part of the case. (*Joy on Confessions*, 62.)

In Regina agt. Owen and others, (9 *Carr. and P.* 238,) the same defendants were tried in 1840 for the murder of the person ravished; and GURNEY, B., refused to receive in evidence the deposition on oath of the prisoners taken before the coroner's inquest, though it must have been known they had been received on the previous trial of the same prisoners for rape. Baron GURNEY, however, cited Wheater's case, then recently tried before COLERIDGE, and admitted he could not, on principle, see the distinction between that and some of the other cases.

In the later case of Regina agt. Sandys, (1 *Carr. and Marsh*, 345,) decided in 1841, the prisoner was tried for murder, and ERSKINE, J., admitted in evidence her deposition taken at the coroner's inquest, and reserved the point for the consideration of the fifteen judges.

All the decisions to which I have referred, except that in the case of Wheater, were made at *nisi prius*, and their general current is certainly in favor of the admissibility of the evidence in question; but to give them, or any of them, much weight as authority, it is necessary to understand the reasons that governed, and to see on what principles they are based. Without that, decisions made at the assizes, necessarily without time for consultation and examination, can avail but little in deciding a controverted question of law.

So far as the evidence was rejected on the ground that the statement was on oath, as in the case of Davis and others, it must now be regarded as settled by the decision of all the judges in Wheater's case above cited, that that of itself constitutes no objection. Mr. Joy, in his treatise on the admissibility of confessions, reviews all the decisions at *nisi prius*, apparently conflicting, and comes to the conclusion that the decision by all the judges in Wheater's case establishes the principle that a statement not compulsory, made by a party not at the time a prisoner under a criminal charge, is admissible in evidence against him, although it is made upon oath. (*Joy on Confessions*, § 8, 62.)

It is now regarded as a well-settled rule, and recognized in the elementary books, that where a witness answers questions upon examination on a trial tending to criminate himself, and to which he might have demurred, his answers may be used for all purposes. (2 *Starkie's Ev.* 50; *Roscoe's Cr. Ev.* 45.) Such answers are deemed voluntary, because the witness may refuse to answer any question tending to criminate him. (1 *Green. Ev.* § 225.) If, however, he should be compelled to answer after claiming his privilege, his answer will be deemed compulsory, and cannot be given in evidence against him.

Where the evidence offered has been rejected on the ground

that the statement was made when the prisoner was in custody charged with crime, as in Wheeley's case and Owen's case, it seems to me clear that it was properly excluded.. Because these were cases of the examination of a prisoner, not of a witness.  In such cases it is a *judicial* examination, and it should not be on oath, and certain precautions for the protection of the accused are always observed.  In this state such examinations are regulated by statute.  (2 *R. S.* 2 *ed.* 794.)  But neither is the statute, nor were the common law rules of which it is declaratory, applicable to any examination except that of a person brought before a magistrate on a charge of crime.  All other examinations are classified as *extrajudicial*, (*Green. Ev.* 216,) and are to be conducted like other cases of the examination of witnesses.

It is evident that in deciding the case of Lewis, above cited, the mind of the presiding judge was influenced to some extent by the supposition, that the facts peculiar to it gave to the testimony the character of a judicial examination, for Baron GURNEY lays stress upon the facts that the deposition was made at the same time as all the other depositions on which she was committed, and on the same day on which she was committed.  In both these resemblances to a judicial examination, the case of Lewis differs from that now before us; for Hendrickson was arrested on a complaint made before a different magistrate, and on a subsequent day.  It is unnecessary, therefore, to express an opinion as to the soundness of the reasons given by Baron GURNEY for his decision in the case of Lewis.

The examination of a witness before a coroner's inquest bears even less resemblance to a judicial examination than that taken before a committing magistrate or a grand jury.  A coroner's inquest may be held in all cases of sudden death, but an examination before a committing magistrate or a grand jury takes place on complaint made that a crime has been committed.  It is only where a person is charged with crime and is examined with regard to the truth of such charge, that his examination can be considered judicial.

In the case of the State agt. Broughton, (7 *Iredell's Rep.* 96,)

decided in North Carolina in 1846, where the grand jury were investigating an offence with a view to discover the perpetrator, and the person who was subsequently indicted was examined before them on oath and charged another with the commission of the offence, it was held that the examination might be given in evidence against the prisoner on the trial of his indictment. RUFFIN, Ch. J., said, however, that if the evidence given by the prisoner had been a confession of his guilt, and the grand jury had found a presentment on it, the court would have held that it could not be given in evidence against him. It is not material to the decision of this case to inquire whether the chief justice was right or not in the distinction he made between a confession and a statement not a confession, because neither in that case nor in the one now before us was there any confession. Both statements tended to turn attention away from the witness. I am inclined, however, to think the chief justice erred in the case of Broughton, in the reason assigned for his decision. For the law seems to be that the rule as to confessions applies not only to direct confessions, but to every other declaration tending to implicate the prisoner in the crime charged, even though in terms it is an accusation of another, or a refusal to confess. (*Green Ev.*, § 219, *note 2, and cases there cited.*) But while the decision in the case of Broughton is in accordance with the ruling in the case before us, the reason given for that decision, if it be erroneous, does not conflict with such ruling.

Independent of any supposed authority, I do not see how, upon principle, the evidence of a witness not in custody and not charged with crime, taken either on a coroner's inquest, or before a committing magistrate or a grand jury, could be rejected. It ought not to be excluded on the ground that it was taken on oath. That reason would exclude also the statements of witnesses on the trials of issues. The evidence is certainly none the less reliable because taken under the solemnity of an oath. No injustice is done to the witness, for he was not bound to criminate himself, or to answer in regard to any circumstance tending to do so. If it is a good ground of exclusion, that the

statement was made as a witness on oath, then the rule of law that protects a witness from criminating himself is of no value, and may at once be abrogated. The rule was adopted upon the supposition that the answer might be introduced in evidence against the witness. If it cannot be, the witness has no longer any reason for claiming his privilege.

Nor can the exclusion of the evidence depend on the question whether there was any suspicion of the guilt of the witness lurking in the breast of any person at the time the testimony was taken. That would be the most dangerous of all tests, as well because of the readiness with which proof of such suspicion might be procured, as of the impossibility of refuting it. Besides, the witness might have no knowledge of the existence of any suspicion, so that his mind could not be affected or his testimony influenced by it. It is only when he is charged with crime, and examined on such charge, that there is good reason for treating him as a party to the proceeding. The common law has been as tender of the rights of witnesses as of parties.

It is the policy of the common law never to compel a person to criminate himself. That policy secures as well to a witness as to a party the privilege of declining to answer. The former is supposed to know his rights—the latter is to be specially instructed in regard to them by the presiding magistrate. But if either fail to avail himself of the privilege, his answer is deemed voluntary, and may be used as evidence.

It is only upon a judicial examination, viz. : in the case provided for by statute where the prisoner is brought before a magistrate charged with crime, that the preliminaries required by statute are to be observed, and the examination taken without oath. All other examinations are *extra judicial.* The former is the examination of a party, the latter of a witness. In all cases, as well before coroner's inquests as on the trial of issues in court, when the witness is not under arrest, or is not before the officer on a charge of crime, he stands on the same footing as other witnesses. He may refuse to answer and his answers are to be deemed voluntary, unless he is compelled to

answer after having declined to do so; in the latter case only will they be deemed compulsory and excluded. Applying these rules to the case before us, Hendrickson's answers before the coroner's inquest were voluntary, and were properly received as evidence against him.

II. The second ground on which the prisoner asks a reversal of the judgment is, that the will of Lawrence Van Deusen, the father of the deceased, was improperly admitted in evidence. The will was dated 1st November, 1851, and by it the testator devised all his property to his wife for life, and after her death to his three children, Lawrence Van Deusen, Maria Hendrickson, (the deceased,) and Susannah Hungerford, one moiety to Lawrence Van Deusen, and the remaining moiety to be equally divided between Maria Hendrickson and Susannah Hungerford. By the will, therefore, the deceased would have received one-fourth part of the estate after the death of her mother. This evidence was received as bearing upon the question of motive. If it tended, in the least, to show that the prisoner had been disappointed in the pecuniary expectations he had entertained from his alliance with the family, in not being able to realize them till after the death of his wife's mother, and then not in an equal proportion with the brother; or, if it tended to show how little property he might expect from his wife, if she lived— in either case, whether the supposed motive was resentment or avarice, it was properly received. It was competent to show whether the prisoner would gain or lose by the death of the deceased, and to compare the small amount expected to be realized at a distant day with the intermediate burden of her maintenance. Taken in connection with the previous testimony, tending to show a want of affection on the part of the prisoner toward his wife, this evidence was clearly admissible. Considerable latitude is allowed on the question of motive. Just in proportion to the depravity of the mind, would a motive be trifling and insignificant, which might prompt to the commission of a great crime. We can never say the motive was adequate to the offence; for human minds would differ in their ideas of adequacy, according to their own estimate of the enor-

mity of crime, and a virtuous mind would find no motive suf£. .cient to justify the felonious taking of human life.

I think the evidence of the will was properly received. I was the province of the jury to determine the weight to which it was entitled.

My conclusion is, that there was no error committed on the trial, and that the judgment of the supreme court should be affirmed.

NOTE.—This decision affirms that of the supreme court, as published in 8 *How* *P. R.* 404.

Mr. Justice SELDEN delivered the following *dissenting* opinion :—

SELDEN, Judge. If we would come to a correct conclusion in this case, we must settle in the outset the fundamental principles upon which it rests. The criterion given in most of the cases by which to determine whether a declaration or confession of a person charged with crime, is competent evidence against him upon his trial, is to ascertain whether it was *voluntarily* made. If *voluntary*, it is said to be competent; otherwise not.

Now it is obvious that this is not a strictly accurate test, notwithstanding the universality of its use for the purpose. A confession or statement made upon the heel of promises of favor may be perfectly voluntary, yet it is rejected. So a statement made under oath before a coroner's jury, while the party is under arrest upon suspicion of guilt, is equally voluntary, as if made as a witness in a case with which he has no connection. He has the same protection in either case, if he chooses to avail himself of it : yet the statement in one case is admissible, in the other not; and in the former case, if, after being expressly cautioned and informed of his immunity, he is not only willing but anxious to give his testimony, it cannot afterward be used against him.

If by voluntary is meant, uninfluenced by the disturbing fear

of punishment, or by flattering hopes of favor, the expression may be accurate. But it is liable to mislead, because it suggests the idea, that the rejection of what are termed involuntary confessions flows from that principle of the common law which is supposed *mercifully* to exempt persons from all obligation to criminate themselves, and which is expressed by the maxim, *nemo tenetur prodere se ipsum.* Were it essential to the conclusion in this case, it might, I think, be shown that we are indebted for this maxim to the *justice,* and not to the *mercy* of the law; and that the principle embodied in it has its foundation in the uncertain and dangerous nature of all evidence of guilt, drawn from the statement of a party conscious of being suspected of crime.

But however this may be, it is certain that the statements of an accused person, made under oath, are never excluded on account of any supposed violation of the immunity of the party from self-crimination. The object of the law is to ascertain truth, and it rejects no evidence, come from what source it may, which is calculated to throw light upon it.

The mental disturbance produced by a direct accusation, or even a consciousness of being suspected of crime, is always great, and im many cases incalculable. The foundation of all reliance upon human testimony, is, that moral sentiment which almost universally leads men, when not under some strong counteracting influence, to tell the truth. This sentiment is sufficiently powerful to resist a trifling motive, but will not withstand the fear of conviction for crime.

Hence the moment that fear seizes the mind, the basis of all reliance upon its manifestations is gone. Speculation as to the effect of the declarations made takes the place of a regard for truth; and this too, in many cases, whether the party be innocent or guilty. If innocent, and yet conscious of the existence of circumstances tending to show guilt, there is the strongest temptation to make such statements without regard to their truth, as will serve to conceal or break the force of these circumstances. Innocent persons have not unfrequently been convicted upon *false* statements of precisely this character.

The mind confused and agitated by the apprehension of danger; cannot reason with coolness; and it resorts to falsehooc when the truth would be safer, and is hurried into acknowledgments which the facts do not warrant.   Neither false statements nor confessions, therefore, afford any certain evidence of guilt, when made under the excitement of an impending prosecution for crime.

So obvious and so undeniable are these principles, that it is rather to be wondered at, that the law has placed the reliance it has upon the declarations of persons accused, than that it has guarded their introduction with so much care.   Few who reflect upon the matter would hesitate, I think, to concur in the sentiments expressed by Baron HOTHAM, in Thompson's case, that " too great a chastity cannot be preserved on this subject." (*Leach's C. C.* 291.)

There is a passage in Hawkins that is so pertinent to, and goes so fully to sustain the view here presented, that I transcribe it, viz.:

" The human mind, under the pressure of calamity, is easily seduced, and is liable, in the alarm of danger, to acknowledge, indiscriminately, a falsehood or a truth, as different agitations may prevail.   A confession, therefore, whether made upon an official examination, or in discourse with private persons, which is obtained from a defendant, either by the flattery of hope, or by the impression of fear, *however slightly* the emotions may be implanted, is not admissible in evidence, for the law will not suffer a prisoner to be made the deluded instrument of his own conviction."

It is said by Joy, in his work on the admissibility of confessions, that this passage has been introduced into some of the later editions of Hawkins, and is no part of the original text. (*Joy on Con.*, 31.)   But however this may be, it does not require the authority of Hawkins, or any other great name, to commend the sentiment of this paragraph to any thinking mind.

Mr. Justice LITTLEDALE, too, in a modern English case, expresses briefly the same idea.   He says: " The object of the rule relating to the exclusion of confessions, is to exclude all

confessions which may have been procured by the prisoner being led to suppose that it would be better for him to admit himself to be guilty of an offence, which he really never committed." (7 *Car. and Payne*, 486.)

Nothing can be clearer, indeed, than that the rule of exclusion rests, not upon the compulsory manner of obtaining the confession, but upon the dangerous and unreliable nature of the evidence ; and it is truly surprising that among the numerous modern cases on the subject there should be so rare a recurrence to the original foundation of the rule ; the judges in almost every instance contenting themselves with allowing the admission or exclusion of the evidence to turn upon the word *voluntary*.

That I have given the true basis of the rule is apparent, not only from the reasoning here adopted, and the authorities already referred to, but is obviously to be deduced from the mass of decisions on the subject, although not expressly asserted in them. In no other mode can they be reconciled with each other ; but viewed in the light of the principles here contended for, they are rendered for the most part harmonious and consistent.

Most of the rules applicable to the reception, upon the trial of persons for crime, of their declarations made while under oath, are incontrovertibly settled. For instance, it is settled that a declaration or confession made *under oath*, while the person making it is a prisoner charged with crime, is never receivable against him upon trial for the crime. It is equally well settled, that if the declaration, although under oath, is made in a judicial proceeding, with which the person making it has no immediate connection, and which has no direct relation to the crime for which he is on trial, it is admissible.

The only question upon this particular subject, to wit: the admissibility of declarations made under oath, which is supposed to be debateable, is, whether the declarations of a person subsequently indicted, made under oath, previously to his arrest, and at a time when he was in no way judicially charged with the crime, are ever to be excluded.

The affirmative of this question is sustained by a series of authorities.

The first case to which I will call attention is that of Rex agt. Lewis, (6 *Car. and Payne*, 161.) This was an indictment, founded upon an English statute, for administering poison to one Elizabeth Davies. It appeared that on the day on which the prisoner was committed, she and several others were summoned before a magistrate, and examined on oath touching this poisoning, there being at first no *specific charge against any person;* but on the conclusion of the examination the prisoner was committed on this charge.

Upon the trial the counsel for the prosecution offered the examination taken before the magistrate in evidence, but it was rejected by Baron GURNEY, who, after referring to a case where an affidavit made by the prisoner had been received, said: "But this being a deposition made by the prisoner at the same time, as all the other depositions on which he was committed, and on the very same day, I think it is not re ceivable."

The next is the case of Rex agt. Davis, (6 *Car. and Payne*, 177.) This was an indictment against father and daughter for receiving stolen goods. Upon the trial it appeared that the daughter had been a witness before the magistrate, and the counsel for the prosecution proposed to ask what she there said; but the same judge, Baron GURNEY, said: "I think you cannot do that. We cannot have anything she said before the magistrate when she was a witness. If after having been a witness you make her a prisoner, nothing of what was said there can be admitted as evidence."

Now, these two cases cannot be reconciled with the notion, that the admission or rejection of such evidence depends upon the question whether the statement was or was not voluntary; unless by voluntary is meant, flowing from a mind free from the disturbing force of great and agitating apprehensions. They have therefore given some trouble to writers upon this branch of the law, who, misled by the use of the term *voluntary*, cling to the idea that such evidence is rejected, because it is obtained

by a species of compulsion, in violation of the rule that no one shall be bound to criminate himself. (*Joy on Con.* 67–8.)

But these cases are not only based upon the soundest reason and the purest justice, but are abundantly sustained by other authorities.

Owen's case (9 *Car. and Payne*, 238) was an indictment against the prisoners, Owen and two others, for murder; and upon the trial it was proposed, on the part of the prosecution, to give in evidence the deposition of the prisoner on oath on the coroner's inquest held on the body of the deceased.

After a very full discussion and citation of authorities, Baron GURNEY, who presided at the trial, excluded the evidence.

There can be no just pretence that in either of these cases, the persons examined were brought before the magistrate or coroner as prisoners charged with the crime. In England, warrants are issued for witnesses in criminal cases, and they are frequently brought before coroners and examining officers in custody.

Joy, in speaking of these cases, says: " It may be observed with respect to these cases, that at the time the depositions were taken, the prisoners were not under charge as prisoners of any crime. They were brought forward, though in custody, only as witnesses." (*Joy on Con.* 68.) This is clearly the inference from the cases themselves, and there can be no doubt of its truth, provided the parties were in custody at all in the two first cases, which does not expressly appear. The report in Lewis's case states that the prisoner was *summoned* before the magistrate.

But the affirmative of the question we are considering does not rest upon these three cases alone.

In Wheeley's case, (8 *Car. and Payne*, 250,) the prisoner was charged with murder. Upon trial the counsel for the prosecution offered in evidence a statement made by the prisoner before the coroner at the inquest. This statement purported to have been made on oath. Baron ALDERSON, who presided at the trial, rejected the evidence, saying: That he not only could not receive the evidence, but that he could not allow

parol evidence to be given to show that the statement was not made under oath.

It is true, that in Owen's case, (9 Car. and Payne, 83,) Godson, one of the counsel, referring to this case of Wheeley, says: That Baron ALDERSON rejected the deposition, "because it was on oath, and taken while he, Wheeley, was in custody." But it will be seen that Godson was then arguing that the deposition of Owen and his associates should be rejected because they were in custody, and he refers to Wheeley's case as a parallel case; this shows that Wheeley was in custody not as the accused party, but as a witness only, precisely as were Owen and his associates.

Besides, Baron ALDERSON himself takes no notice of the fact that Wheeley was in custody, and makes that no part of the ground of his decision. It is clear, therefore, that this case is to be added to the three previously cited, as involving the same principle.

There is an additional English case cited in a note to Haworth's case, (4 Car. and Payne, 254.) The note states, that "in a case tried at Worcester, where it appeared that a coroner's inquest had been held on the body, and it not being suspected that B. was at all concerned in the murder of A., the coroner had examined B. upon oath as a witness. PARK, J., would not allow the deposition of B., so taken on oath at the coroner's inquest, to be read in evidence on the trial of an indictment afterward found against B. for the same murder."

These five constitute the series of English cases going to sustain the affirmative of the question proposed. It is to be observed, however, that the last of these cases goes further than is necessary to sustain the objection taken to the evidence in this case, because, it is expressly stated that the prisoner at the time of his examination before the coroner was not suspected of being at all concerned in the murder.

I will refer to a single American case only, to wit; Broughton's case, (7 Iredell, 98.) In that case, although the testimony of the prisoner given before the grand jury upon an inquiry into the circumstances of the murder was admitted upon special

grounds, yet Chief Justice RUFFIN, in giving the opinion of the court, says, that "Lewis's case (6 *Car. and Payne*, 161) was properly decided."

I come now to the consideration of a class of cases which have been supposed to conflict with those previously cited, but which are, in truth, in perfect accordance with them.

The first to which I deem it necessary to refer is Merceron's case, (2 *Stark. R.* 266.) That was an indictment against the defendant for misconduct as a magistrate. Upon the trial it was proposed to prove on the part of the prosecution what had been said by the defendant, in the course of his examination before a committee of the House of Commons, appointed for the purpose of inquiring into the police of the metropolis. The defendant had been compelled to appear before a committee.

It was objected by the defendant that the examination having been made under compulsory process from the House of Commons, it was not voluntary, and therefore was not admissible. Justice ABBOTT admitted the evidence.

It seems that this same justice afterward, when Lord Tenterdon, in Rex agt. Gilham, (1 *Mood. C. C.* 203,) on Merceron's case being cited, said : " I think there must be some mistake in that case ; the evidence must have been given without oath, and before a committee of inquiry, where the witness would not be bound to answer."

This remark shows that the learned judge was laboring at the moment under the delusive impression which the indiscriminate use of the word voluntary, to test the admissibility of evidence in such cases, has tended to produce.

The next is Haworth's case, (*Car. and Payne*, 254.) This was an indictment for forgery. On the trial the counsel for the prosecution called the clerk of the magistrate by whom the defendant had been examined, who stated, that "before the prisoner was either charged or *suspected* of having committed any offence," he was called as a witness against one Shearer, who was tried for forgery, and sworn to a deposition.

The deposition was offered in evidence and objected to, but admitted by Mr. Justice PARK.

Why was it stated in the report of this case, that the deposition was made not only before the prisoner was charged with, but before he was suspected of guilt? The idea which prompted this statement could have been no other than that for which I contend: that if he had testified under the mental agitation which would be produced by the apprehension of an immediate prosecution for crime, his statement could not be received.

But this idea is more distinctly brought out in the next, to wit: Tubby's case, (5 *Car. and Payne*, 530.) It was a trial for burglary. The counsel for the prosecution proposed to read a statement made upon oath by the prisoner at *a time when he was under no suspicion.* The evidence was objected to, but VAUGHAN, B., said: "I do not see any objection to its being read, as *no suspicion attached* to the party at the time. The question is—Is it the statement of the prisoner on oath? Clearly not; for he was not a prisoner at the time when he made it."

Now, although the learned judge puts his decision *in part* upon the ground that the party was not in custody when he made the statement, yet the first reason he gives is, that *no suspicion* then attached to him.

These cases, so far from conflicting with the cases of Lewis, and Davis, and Owen, tend, in my view, strongly to confirm them, from the countenance they give to the principle upon which those three cases rest; which is, that declarations made when the mind of the party making them is disturbed by the apprehension of a prosecution for crime, and under the constraint of an oath upon a judicial inquiry *as to the crime,* are not evidence against the party upon a subsequent trial for the same crime.

There are besides these, two cases, to wit: Owen's case, (9 *Carr. and Payne*, 83,) and Sandy's case, (1 *Carr. and Marsh*, 345,) in which the deposition of the prisoner on trial for murder, taken upon the inquisition before the coroner, and when the prisoner had not been charged with the crime, were received in evidence upon the trial; but in both cases the question was reserved for the opinion of the fifteen jugdes, and the prisoner having been acquitted in each case, the question *was never passed upon.*

Independently of the case of Wheater, therefore, (2 C. C. 45,) there is no authority which conflicts with the cases which I have cited as going to sustain the objection taken in this case. As the case of Wheater was brought before the fifteen judges, and as this is the case which has been treated as most in conflict with those of Lewis, Davis, &c., it deserves some consideration.

It was a trial for the forgery of an acceptance to a bill of exchange. The bill had passed through the hands of the prisoner's father, who had subsequently become bankrupt; and the prisoner was examined as a witness touching the bill in question, among others, before the Commissioners in Bankruptcy.

He was attended by counsel, and informed that he was at liberty to decline answering any question. Previous to his examination before the commissioners, he had been brought before the Lord Mayor, and charged with the forgery, but had been discharged for want of sufficient evidence to warrant his commitment.

His examination before the commissioners, which was upon oath, was offered in evidence against him upon the trial, and objected to, but received. The prisoner was convicted; and upon the question being brought before the judges, the conviction was sustained.

This is undoubtedly the strongest case to be found in favor of the reception of the sworn statements of a prisoner in evidence against him upon his trial for crime; but there are several things to be remarked concerning it. In the first place, the statement offered in evidence, was not made upon any judicial examination or inquiry respecting *the crime* for which the prisoner was on trial.

This is a marked feature, which distinguishes this case from every one of the five cases above cited, in which the statement on oath of the prisoner was rejected; as well as from the one at bar. The case of Wheater was evidently considered as falling within the settled rule, that the previous declarations of a prisoner, although under oath, if made in a proceeding foreign to the crime with which he is charged, are competent evidence

against him upon the trial. The doubt in this case was really raised by the two circumstances, that the inquiry before the commissioners related in part to the same bill alleged to have been forged; and that the prisoner, when examined, was obviously resting under strong suspicion of the forgery. This, however, was not thought sufficient to take the case out of the ordinary rule.

That this was the view taken of the case is evident from the remarks made by several of the judges upon the argument. Baron PARK, addressing the counsel for the prisoner, says: "Here the commissioners had a right to examine the prisoner. Do you mean to say, that if a person, *on a trial between parties*, choose to make certain answers, they may not be used after-ward against him? And LITTLEDALE J., says: 'Suppose, in answer *to a bill in equity*, a party state facts which afterward are found to chime in with other facts, are they not admissible in evidence against him?'" The distinction between the class of cases to which the case of Wheater was treated by the judges as belonging, and to which it evidently did belong, and those where the evidence offered was obtained under the constraint of an oath, administered upon a judicial inquiry in regard to the very crime for which the prisoner is on trial, is obvious, and runs through all the cases.

The reason for the distinction between the examination of a party upon a direct inquiry as to the crime, with which he is afterward charged, and his testimony in another case, is well stated by Mr. Greenleaf in his work on evidence. (1 *Green. Ev.*, sec. 226.) After stating the decision in Rex agt. Lewis, before cited, he says:—"This case may seem at the first view to be at variance with what has just been stated as the general principle in regard to testimony given in another case; but the difference lies in the different natures of the two proceedings. In the former case the mind of the witness is not disturbed by a criminal charge; and, moreover, he is generally aided and protected by the presence of the counsel in the cause; but in the latter case, being a prisoner, subjected to an inquisitorial examination, and himself at least *in danger* of an accusation,

his mind is brought under the influence of those disturbing forces, against which it is the policy of the law to protect him."

Mr. Greenleaf makes no use of the word *voluntary* in illustrating this distinction.

To review for a moment our ground.  It will be seen that there are three distinct classes of cases in which, upon the trial of persons for crime, their previous statements upon oath may be offered in evidence against them, viz. :

1.  When the oath was administered, not upon any direct investigation as to the crime itself, but in some other suit or proceeding.

2.  When it was administered by a magistrate engaged in a preliminary examination as to the crime ; and,

3.  Where it was taken before a coroner's jury.

We shall be able to form a clear idea of the state of the authorities on the subject, by arranging them according to this classification.  Of the cases cited, Merceron's case and Wheater's case belong to the first class ; and in both of these cases the evidence was received.

Lewis's case, Davis's case, and Haworth's case, belong to the second class.   In the two first, the proof offered was rejected ; and in the last it was received, it being expressly stated in the case, that the statement was made "before the prisoner was either charged or suspected of any crime."

The other cases, viz. : Owen's two cases, Wheeley's case, Sandy's case, and the anonymous case stated in the note to Haworth's case, all belong to the third class.   In three of these the evidence was rejected ; in the other two, to wit, Owen's first case, and Sandy's case, although it was received, the question was expressly reserved for the opinion of the fifteen judges, and never afterward passed upon.

The case of Broughton is *sui generis*, and has but little bearing upon the question, because it is put upon a distinct and peculiar ground, while it expressly recognizes the accuracy of the decision in Lewis's case.

This classification discloses the striking fact, that there has,

so far as appears, never yet been a single reported decision in. favor of the admissibility under any circumstances, upon a trial for murder, of the examination of the prisoner before a coroner's jury.

The two cases in which it was received reserving the question, have not the weight of decisions even at the assizes; because that is the only mode in which the opinion of the court in *banco* in England can be obtained. So far as authority goes, therefore, there are three decisions at the English assizes against, and not one any where in favor of its admis sibility.

There is just reason for grouping examinations before a coroner's jury in a distinct class. The nature of the crime, the time of holding such inquisitions—immediately upon the death— the public excitement, and the circumstances usually attendant, are peculiarly calculated to produce that serious disturbance of the faculties, against which, in the language of Greenleaf, "it is the policy of the law to protect men." It ought not, therefore, to be matter of surprise that there is no decision in favor of the admissibility of such examinations in any case, even where it appears, as it did in the anonymous case decided by PARK, J., that no suspicion attached to the party when the examination was taken. I hold the decision in that case, and the one in Wheeley's case, to be right. But whether they can be sustained or not, there can, I think, be no doubt of the propriety of excluding the evidence, where the party, when testifying before the coroner's jury, is conscious that suspicion is resting upon him. It would be inadmissible under such circumstances, even when taken before the examining magistrate. This has been held in every case upon the subject. Haworth's case is no exception. *A fortiori*, then, it should be excluded when taken upon an inquest by the coroner.

It is only necessary to look at the question put to Hendrickson upon his examination, to see that he must have been fully aware that he was suspected. The repetition of the question as to the time when he was last in Albany, and the questions as to his having visited the drug store, could not fail to have

The People agt. John Hendrickson, jr.

suggested to his mind the fact that suspicion was directed to him.

In view, therefore, of the reasoning and authorities here presented, I have no hesitation in coming to the conclusion, that the admission upon the trial of this case of the statements of the prisoner made on oath before the coroner's jury was erroneous, and that a new trial should be granted for that reason.

Although this conclusion is decisive of the case, it may be expedient to express briefly an opinion as to the admissibility of the will of Lawrence Van Deusen, as evidence to the jury. I have been unable to take any view of the case which would show this will to be relevant and pertinent evidence. Its relation to the issue, if any, is so remote, and its bearing so uncertain, that I cannot perceive that it could furnish a safe foundation for any inference whatever. In criminal, and especially capital cases, too much care can hardly be taken to guard the minds of the jury from the influence of testimony which can have the slightest tendency to mislead. As the testimony concerning the will was received by the judge, under objection, the jury would naturally seek to make some use of it, and to draw from it some inference bearing upon the issue to be determined.

I am, therefore, decidedly of opinion that this evidence was improperly received; and that for this reason, also, a new trial should be granted.

GARDNER, C. J., and ALLEN, J., concurred with Judge SELDEN in the opinion that a new trial should be granted, the former upon the second, and the latter upon the first ground discussed in the foregoing opinion.